UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BRYANT CARTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 1:10-cv-01669-TWP-DKL |
| v. ) | |
| ) | |
| ELI LILLY & COMPANY, ) | |
| ) | |
| Defendant. ) | |

**ENTRY ON DEFENDANT'S SUMMARY JUDGMENT MOTION**

This matter is before the Court on Defendant Eli Lilly & Company's ("Lilly") Motion for Summary Judgment. The Plaintiff in this case, Bryant Carter ("Mr. Carter"), has filed a lawsuit against Lilly, pursuant to 42 U.S.C. § 1981, alleging that while he was employed with the pharmaceutical company in a position designed to develop future managers, Area Sales Director Carlos Crawford ("Mr. Crawford") discriminated against him because of his race. More specifically, Mr. Carter claims that Mr. Crawford failed to offer him a training opportunity and opined negatively about him during a conference call convened to assess his progress as a recruiter. This, according to Mr. Carter, stifled and delayed his ability to be promoted. For the reasons set forth herein, Lilly's Motion for Summary Judgment (Dkt. #48) is **GRANTED**.

**I. BACKGROUND**

After graduating from college in 1999, Mr. Carter, who is African American, began working for Lilly as a Sales Representative. Ahead of expectation, he advanced to Senior Sales Representative after only two years. In January 2003, he moved to a Recruiter position, responsible for supporting managers in Texas and the southwest with the recruitment and screening of candidates for the Lilly sales force. A recruiter, like another field position known as

"Sales Trainer," was a regional field position which Lilly used to groom persons thought to have management potential. Until a Lilly field employee advances to a management level position, they are known as Associates. The order in the field organizational hierarchy is Associate, Manager and then Director.

There was a two phase approach to grooming a Recruiter for management, which Mr. Carter's supervisor, Heidi Rohloff ("Ms. Rohloff"), helped memorialize in a summary document titled "Recruiting Developmental Roadmap" ("the Roadmap"). Ms. Rohloff's job was to supervise those Associates in recruiting roles. According to Ms. Rohloff, the Roadmap was provided to the recruiter to "make sure they were getting the development they needed" as they progressed toward a goal of becoming a District Manager. A Recruiter or other individual in a developmental position could apply or post for a managerial position at any time, but in order to be considered for a managerial position, the person needed to have the support of their direct supervisor. And, as noted by Ms. Rohloff, from a practical standpoint that support would not be there for a recruiter until they demonstrated that they had obtained the experience and mastered the goals in the second phase of the Roadmap.

The first phase of the Roadmap was referred to as "learn[ing] the job" and the Roadmap reference for the second phase was "master the job/improve the job and increase additional developmental opportunities." Within the Roadmap there are activity descriptions, in bullet point form for both phases, under the subtitles of "Job Activities," "Required Classes" and "Required Reading." In addition, for each phase the Roadmap sets forth expected "Developmental Areas" both with regard to the specific job and outside the recruitment activities. For example, under the first phase, the recruiter is expected to seek mentoring and feedback from District Managers, shadow different managers and attend district meetings. The

first phase was expected to take six to nine months to master the basic recruiting skills and show significant progress toward meeting the goals in the described developmental areas.  Thereafter, a recruiter would move on to obtaining the second phase developmental experience and working toward the goals in that phase.  Though it depended on the individual and the demand for district sales managers at the time, on average it took two years for a recruiter to complete the Roadmap and be in a position to be recommended for openings in management.

A developmental review team was convened periodically to review the recruiter's progress with his supervisor.  A recruiter chooses his own review team, and in Mr. Carter's case it was made up of several of the district sales managers he was servicing along with Area Sales Director Mr. Crawford, to whom some of those district managers reported.  During conferences, the team's function was to exchange views regarding the recruiter's progress, help determine if the recruiter was ready to move on to higher goals and, eventually, whether to recommend the recruiter as "management ready."  While the members of the team were also to assist in various ways with the mentoring of the recruiter and allow him to obtain the relevant experience, it was the recruiter's responsibility to follow the Roadmap, discuss the same with his supervisor and seek and obtain the relevant experience required to move on.

In October 2003, Ms. Rohloff moved from her supervisory role over recruiters to a new position in the company.  Nevertheless, because she had been Mr. Carter's only recruiting supervisor up to that point, she organized a conference call with his developmental review team to assess his progress in phase one of the Roadmap and, as she states, to determine if it was time for Mr. Carter to "move to more phase two type developmental activities."  It was not a conference call to determine if Mr. Carter was management ready.  He was only nine months on the job and had yet to move to phase two of the Roadmap or meet all the goals outlined for him.

3

Ms. Rohloff obtained comments ahead of the call from three of the district managers who could not participate. The actual participants on the call included six District Managers, Area Sales Director Mr. Crawford[1], and Ms. Rohloff.

Mr. Crawford had intermittent interaction with Mr. Carter when he and Mr. Carter were in the same office in Texas, but he had no supervisory responsibilities for Mr. Carter or any other recruiters. Mr. Crawford testified that he remembers the details of only one professional conversation with Mr. Carter, when he coached Mr. Carter to take advantage of opportunities to actively participate in candidate interviews so that he could learn more about selecting talent. The conversation the two had occurred around the time of the October 2003 conference call, but Mr. Crawford is unsure of exactly when the discussion took place. Mr. Crawford claims the feedback he received from his district managers lead him to conclude that Mr. Carter was performing more in an administrative capacity and that he needed to start providing feedback on the candidate interviews.

The key points of the discussions and conclusions reached during the conference call were detailed in a written summary prepared by Ms. Rohloff for coaching purposes. That document was given to Mr. Carter and all members of his developmental team. The final conclusion was expressed as follows: "With minor "tweaks" in phase I of the developmental roadmap, Bryant will then be on track to move toward the phase II developmental areas. These experiences can be obtained in his current assignment by focusing more attention [on] 'leaving a footprint in recruiting' and on his development." The summary also contained a description of

---

[1] Titles in the Lilly sales units changed with time and Mr. Crawford has been referred to in the record as both an Area Sales Manager and an Area Sales Director while Mr. Carter was a recruiter. Regardless of his applicable title at the time, he was a step above the District Managers serviced by Mr. Carter. While he did not directly supervise the recruiter position, Mr. Crawford was expected to assist in the development of the person filling that role within his sales area.

the assessment of Mr. Carter's strengths and developmental needs as well as action steps for him to take in moving forward.

In comparison to other recruiters she supervised, Mr. Rohloff was of the opinion that Mr. Carter was "doing fine" and had gotten off to a "solid start." At deposition, Ms. Rohloff stated she found the conclusion reached during the review team's conference call to be reasonable, but she had voiced some disagreement with Mr. Crawford, who questioned whether Mr. Carter had gained sufficient developmental experience to date.

> Q. If you don't recall this, obviously tell me, but did you think that Mr. Carter had progressed further in his progression towards readiness for a management position than Mr. Crawford thought he had?
>
> A. I think the difference was where I saw Bryant doing the recruiting work, you know, that he was off to a solid start. I think where Mr. Crawford was, is things like hey, he's not reaching out to me, he's not asking the DMs if they'll mentor him, or he can come to meetings. He's not -- you know, some of these other things that he could be doing, back to Exhibit 4[Roadmap], he wasn't -- he wasn't taking advantage of those opportunities there. And so his feedback was let's see him show more leadership within the recruiting team and see him work with myself and the DMs more before we add more to his plate. So that was the difference in opinion. And like I said, I felt like that was a reasonable outcome when you look at it.

Ms. Rohloff did not recall any of the specific comments made by the other participants in the telephone conference, but states that the conclusions she documented were those reached by the team as a whole.

Sometime near the October 2003 conference call, one of Mr. Crawford's District Managers in California needed to be replaced temporarily while she was on maternity leave. Typically, those occupying developmental positions such as sales trainer or recruiter are assigned to take on such "relief" responsibilities. Mr. Crawford gave the assignment to Mark Aguillard ("Mr. Aguillard"), a sales trainer reporting directly to Mr. Crawford who was coaching sales representatives in Mr. Crawford's sales area. Mr. Crawford claims he believed Mr. Aguillard

5

would get off to a fast start because of his experience with the sales representatives, the products they were promoting and his experience participating as part of Mr. Crawford's management team.  Mr. Aguillard is Caucasian.

As a result of discussions with District Managers who had been on the October 2003 conference call, Mr. Carter learned of Mr. Crawford's suggestion that Mr. Carter had yet to have sufficient developmental experiences to advance to phase two.  Both before and after the conference call, Mr. Carter attempted to reach out to Mr. Crawford for mentoring and additional developmental experience (such as job shadowing), but each time he did so Mr. Crawford either did not have time to meet or he cancelled meetings at the last minute, claiming scheduling problems.  At Mr. Carter's request, his supervisor removed Mr. Crawford from Mr. Carter's developmental team and replaced him with another Director, Doug Opel.

A hiring freeze in 2004 delayed the next conference call to review Mr. Carter's developmental progress, which typically would have been to determine if he was management ready.  After the freeze was lifted, Mr. Carter's supervisor, Melissa Popa ("Ms. Popa"), arranged for the conference call to occur in the summer of 2005.  Following the conference call Mr. Carter was told he was management ready and could start posting for management openings.  However, Mr. Carter never posted for any management openings.

In mid-September 2005, Mr. Carter received negative feedback from Ms. Popa and his new supervisor, John Covington ("Mr. Covington").  Mr. Covington's follow-up email advised Mr. Carter that he was not meeting "basic expectations" for the recruiting role and that, as a result, he was no longer eligible to apply for District Manager positions.  The email further advised Mr. Carter that if he did not improve his performance he would be entering Lilly's performance discipline model.  Around that same time period, Mr. Carter decided he wanted to

leave Lilly.  Mr. Carter was told in a meeting that recruiters were going to be traveling more in the coming year, which he disliked because he was already rarely home.  He did not expect that there would be a large number of management positions opening up and he believed that managers who were being displaced elsewhere in the organization would have a leg up on an Associate looking for a District Manager position.  Further, Mr. Carter referred to himself as "geo-restricted," because he did not want to move out of Texas.  In short, he never sought to fill any District Manager openings.

Mr. Carter took a medical leave from Lilly in February 2006 and resigned in June 2006, without ever returning to work.  He claims he was worn down by his experience with Mr. Crawford, the demands of the job, including travel, and the unreasonable expectations of some managers, which Mr. Carter characterizes, generally, as the "management beat down."

Subsequent to Mr. Carter's leaving Lilly[2], and as a result of an anonymous call to the company's human resources hotline, the company investigated a claim that Mr. Crawford had used a derogatory term when referring to an African American.  A member of Mr. Crawford's sales team informed the investigator that he and another Lilly employee were present when Mr. Crawford responded to an invitation to attend a San Francisco Giants baseball game to see Barry Bonds play.  According to that person, Mr. Crawford responded to the verbal invitation by stating:  "I don't want to see that baboon play."  Another witness interviewed as part of the investigation responded to inquiries regarding discriminatory or inappropriate statements which may have been made by Mr. Crawford during a meeting where Mr. Crawford was explaining the complexities of a particular market being covered by a Lilly sales representative who was Asian, and stated:  "I think we might be applying some Far East math to this business."

---

[2] Mr. Crawford testified in his deposition, taken in October of 2011, that the investigation took place "four or five years ago."

When asked by the investigator, Mr. Crawford claimed he did not recall the baseball situation or making any comment regarding Barry Bonds. He indicated he did not recall making the Far East math comment either, but he may have said something akin to "being as hard as Chinese arithmetic." Lilly's investigation resulted in a "coaching session" for Mr. Crawford, and the investigative report concludes as follows:

> Documented coaching on awareness of impact vs intent regarding word choice (ie. Far East math). There are two mitigating factors: 1) no prior situations or discipline – Carlos has a 18 year history at Lilly in which no other allegations in this nature have been brought forward. Dave Noesges has supervised Carlos at both the G2 and G4 levels and has no data points to support the allegations. 2) Carlos denied the comment about Barry Bonds, but if it did occur, it was a remark made about a specific person not a generalization about a minority group and it could be attributed to his steroid use, not necessarily his ethnicity.

Mr. Carter's discrimination claim was severed from a class action lawsuit filed against Lilly in 2006. In the case before the Court now, he asserts that Lilly discriminated against him on the basis of his race. He complains of Mr. Crawford's failure to train him and being held back from moving into phase two of the Roadmap for development used to groom recruiters for management, thereby delaying his eligibility to post for a sales manager position.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if Athe pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.@ *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews Athe record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party=s favor.@ *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, A[a] party who bears the burden of proof on a particular issue may not rest on its

pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

### III.  DISCUSSION

Mr. Carter asserts that he has adduced evidence sufficient to support a *prima facie* case of discrimination under the indirect method of proof, the proof template outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3] For a failure to promote claim, the template has been described as requiring a plaintiff to show that: (1) he is a member of the protected group; (2) he was qualified for the promotion sought; (3) he was rejected for the position; and (4) the employee receiving the position was not a member of the protected group nor better qualified. *Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731, 737 (7th Cir. 2006). If Mr. Carter meets his *prima facie* case burden, the burden then shifts to Lilly to articulate a nondiscriminatory reason for its decision. *Id.* If Lilly does so, the burden then shifts back to Mr. Carter and he is required to produce evidence which would support a conclusion that the reason articulated by Lilly is a pretext for discrimination. *Id.*

---

[3] The recognized methods of proving race discrimination are the same whether the claim is one under 42 U.S.C § 1981 or Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1). *Egonmwan v. Cook County Sheriff's Dept.,* 602 F.3d 845, 850 n.7 (7th Cir. 2010). Ergo, it matters not which of the two statutes is invoked.

Mr. Carter contends that his is both a failure to promote claim and a failure to train claim, and that the *McDonnell Douglas* framework is not rigid and must adapt to the circumstance of the case. The "failure to promote" which Mr. Carter complains of is the delay resulting from his not being allowed to move forward as quickly into phase two of the Roadmap. He contends the failure to train resulted from Mr. Crawford's selecting Mr. Aguillard over him to fill the relief manager role when the District Manager in California was on maternity leave. Lilly's first response is that regardless of whether you title his claim as one for failure to train and promote or delayed training and promotion, Mr. Carter must have experienced a materially adverse employment action in order to make a *prima facie* case, and none exists in this case.

The Court agrees with Mr. Carter that the *McDonnell Douglas* template is intended to be flexible enough to adapt to different situations.

> The importance of McDonnell Douglas lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.

*International Broth. of Teamsters v. U.S.,* 431 U.S. 324, 358 (1977). However, that flexibility does not stretch so far as to eliminate the requirement that a plaintiff show that they suffered an adverse employment action. And, to qualify as an adverse employment action, the conduct complained of must be "materially" adverse, meaning more than just an inconvenience and usually, but not always, involving some economic consequence. *Whittaker v. Northern Illinois University,* 424 F.3d 640, 647-48 (7th Cir. 2005). In short, Mr. Carter must show that the actions of Mr. Crawford "materially altered the terms and conditions of [his] employment." *Threatt v. Donovan,* 380 Fed. Appx. 544, 548 (7th Cir. 2010); *see also, Whittaker,* 424 Fed.3d at 648.

In this case, Mr. Carter cannot cross that threshold of materiality. There are a number of reasons why a review of the record can lead to no other conclusion.

**A.     The Nature of the Conference Call**

In many ways, Mr. Carter is seeking to have the October 2003 conference call treated as though it were one set up to determine if he was ready to seek promotion to management, and that is not the case at all. Ms. Rohloff, whom Mr. Carter describes as the best and most supportive boss he ever had at Lilly, stated that with only nine months on the job as a recruiter there was no chance of any discussion during the call about deeming Mr. Carter "management ready." Mr. Crawford characterizes the call as one which was intended to have a positive impact on his career by defining for him the things he was doing well and the things he needed to work on. Ms. Rohloff described the call as having two purposes; first, to assist in providing coaching points for Mr. Carter and second, to assess whether he should begin to focus on phase two goals and activities.

While the conclusions reached during the telephone conference may have slowed Mr. Carter's progress toward his goal of becoming management ready, it had no economic impact on him and did not alter the terms or conditions of his employment. In essence, it was an intermediate evaluation of his performance, and its conclusion – the need for "minor tweaks" to be ready for phase two activities – can hardly be seen as completely negative. Even then, a negative performance evaluation, alone, is not considered an adverse employment action. *Beamon v. Marshall & Ilsley Trust Co.,* 411 F.3d 854, 862 (7th Cir. 2005).

**B.     Mr. Carter Progressed To and Completed Phase Two**

The record is clear that Mr. Carter accomplished whatever minor tweaks were necessary to allow him to move forward with phase two activities and that he completed those phase two

11

activities as well. The developmental activities which Mr. Carter was expected to proactively pursue involved or required the cooperation of district managers. The Roadmap encouraged some interaction with area directors like Mr. Crawford, but to a much lesser extent. While Mr. Crawford may have been lax or slow in providing Mr. Carter the opportunities for experience with him which Mr. Carter expected to gain, he did not prevent, and in fact encouraged, Mr. Carter to interact more with the District Managers when they were performing various responsibilities. Indeed, that was the major shortcoming Mr. Crawford identified in the telephone conference.

Importantly, Mr. Carter removed Mr. Crawford from his developmental review team shortly after the conference call and Mr. Carter has no complaint with regard to the cooperation he received in obtaining developmental opportunities from the District Managers or others. He was able to obtain the experience and reach the phase two goals required for him to be deemed management ready. Again, it is important to remember that it was the recruiter who was expected to seek out and obtain the various experiences set forth in the Roadmap and not a responsibility of those in management roles above him to provide those opportunities.

**C.     2004 Hiring Freeze Prevents Review of Mr. Carter for "Management Ready" Purposes.**

Mr. Carter contends that at a minimum Mr. Crawford's remarks during the conference call caused his readiness for management determination to be delayed by six months. That assertion does not add up either. Ms. Rohloff testified that the average time spent in a recruiting position before being deemed management ready was two years and that the earliest that one of her charges was deemed ready was 18 months. At the eighteen month mark of Mr. Carter's tenure, there was a hiring freeze, which Mr. Carter admits caused his second developmental review conference call to be delayed. So, even if he had moved more rapidly into phase two

activities, the limitations imposed by the hiring freeze restricted his ability to be deemed management ready.

Just as important, by the middle of 2004, Mr. Crawford had nothing to do with whether Mr. Carter was reviewed or deemed management ready. In fact, Mr. Crawford had been out of the picture for quite some time. Further, Mr. Carter's 2004 performance reviews and the results of his management assessment test that year provided mixed feedback, which may have contributed to any delay in his progress toward being assessed for "management ready" status.[4] While it is unclear from the record how long the hiring freeze was in place, it is abundantly clear that by the two year mark in January 2005, Mr. Crawford had no input into when or if Mr. Carter would be deemed management ready and the blame for any delay in assessing him at that point must be laid elsewhere.

### D. Mr. Carter Did Not Seek a Promotion, nor Identify One He Believes He Would Have Obtained

Mr. Carter never sought a promotion. Admittedly, seeking a promotion without the support from his supervisor, which would only come with completion of phase two, would have been fruitless. Nevertheless, even after being deemed management ready and receiving encouragement to apply for district sales manager positions, Mr. Carter did not seek to become a manager. Moreover, not applying for a promotion, because it would have been fruitless, does not excuse his failure in this lawsuit to identify a promotional opportunity that he believes he missed. If a plaintiff's claim is based upon his belief that he should have been promoted earlier, he must identify the particular promotion he believes he should have received. *Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 273-74 (7th Cir. 2004). Whether through discovery or

---

[4] Lilly argues that at various points in Mr. Carter's tenure his periodic performance reviews demonstrated less than acceptable performance and that he was not meeting all of its expectations. However, based on the testimony of Ms. Rohloff, while Mr. Carter's reviews revealed both his strengths and weaknesses and his test score was not superior, none of these things were so bad as to cause him to be taken off the management track.

otherwise, if Mr. Carter believes he was delayed from seeking career advancement opportunities based on what he asserts were Mr. Crawford's race based actions, he needs to identify what those opportunities were. *See Patt v. Family Health Systems, Inc*., 280 F.3d 749, 753 (7th Cir. 2002) (plaintiff claiming doctors kept her from advancing her surgical career never identified which operations she was precluded from performing or how she was precluded from performing them). Without such identification, there is no way to know if any open sales management positions existed which Mr. Carter could have otherwise applied for, and no way for the court to measure any potential loss other than speculation.

**E.     No Evidence of Any Impact of Mr. Crawford's Choice of Mr. Aguillard**

Mr. Carter claims that Mr. Crawford's choice to have Mr. Aguillard provide relief assistance for a District Manager in California who was away on maternity leave was discriminatory. Mr. Crawford admits that he never considered anyone else for the role. However, Mr. Crawford's explanation for selecting Mr. Aguillard is difficult to challenge. Mr. Aguillard was part of Mr. Crawford's management team, served as a trainer for sales representatives in that particular California area and was familiar with the product being promoted. Mr. Carter claims none of those advantages and, clearly, had less experience working with Mr. Crawford.

Furthermore, Mr. Carter fails to identify the impact of his not being considered for the position. There was no specific requirement that he serve as a relief manager in order to be deemed management ready. Mr. Carter asserts that the choice of Mr. Aguillard amounted to a failure to train him. Citing *Pafford v, Herman,* 148 F.3d 658 (7th Cir. 1998), and such a failure to train need not have a financial impact in order to support a claim of discrimination under the indirect proof methodology. However, in *Pafford*, the court assumed, absent objection from the

defendant, that the specific failure to train allegations amounted to a material adverse employment action. *Id*. at 667. There was no specific finding by the court that the failure to train was materially adverse. Furthermore, Mr. Carter is not complaining about a specific training program or requirement, but of Mr. Crawford's failure to select him to fill in temporarily for another person while they are on maternity leave. The temporary assignment did not involve any new title, or increase in pay and did not include important human resource functions. There is no evidence that the temporary assignment offered materially preferred training management above that available in Mr. Carter's own developmental position.

## IV. CONCLUSION

At Mr. Carter's request, Mr. Crawford served only briefly on his developmental review team. Mr. Crawford was never Mr. Carter's direct supervisor. The fact that Mr. Crawford provided extra duties to an area sales trainer instead of Mr. Carter and provided input more critical than others in a conference call to assess Mr. Carter's progress, does not constitute an adverse employment action. There was no economic impact on Mr. Carter and he cannot show that he otherwise would have applied for and received a promotion. For these reasons, Mr. Carter has not met his burden of demonstrating a *prima facie* case and there is no need to progress further through the burden shifting progression of the *McDonnell Douglas* indirect proof template. Lilly's Motion for Summary Judgment (Dkt. #48) is hereby **GRANTED**. A separate final judgment shall be entered in favor of Defendant Eli Lilly & Company and against the Plaintiff Bryant Carter.

SO ORDERED.

Date: 09/25/2012

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kevin W. Betz
BETZ & BLEVINS
ebetz@betzadvocates.com

Matthew L. Schmid
SANFORD WITTELS & HEISLER, LLP
mschmid@swhlegal.com

Sandra L. Blevins
BETZ & BLEVINS
sblevins@betzadvocates.com

Ellen E. Boshkoff
FAEGRE BAKER DANIELS, LLP-Indianapolis
ellen.boshkoff@faegrebd.com